**QUEENSBORO FARM PRODUCTS, Inc., v. WICKARD, Secretary of Agriculture.**

No. 2556.

District Court, E. D. New York.

Oct. 19, 1942.

Harry Polikoff, of New York City, for plaintiff.

Harold M. Kennedy, U. S. Atty., of Brooklyn, N. Y. (Nathan Borock, Asst. U. S. Atty., of New York City, and Edward O. Mather, Principal Atty., Office of the Solicitor, U. S. D. A., of Washington, D. C., of counsel), for defendant.

ABRUZZO, District Judge.

This is a motion for summary judgment in favor of the defendant under Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Simultaneously therewith, the plaintiff filed a cross-motion for summary judgment in its favor.

This action arises out of a ruling by the Secretary of Agriculture upon a petition filed by the plaintiff pursuant to Section 8c(15) (A) of the Agricultural Marketing Agreement Act of 1937, 7 U.S.C.A. § 608c (15) (A). The plaintiff, dissatisfied with the ruling in question, filed the complaint herein for the purpose of reviewing that ruling, pursuant to Section 8c(15) (B) of the Act aforesaid.

It is conceded that the issue is one of law only. The essential facts as presented before the administrative agency are not in dispute.

The jurisdiction of this forum to entertain the present proceeding is conferred by Section 8c(15) (B) of the Agricultural Marketing Agreement Act of 1937, 7 U.S.C.A. § 608c(15) (B). Neither party contests the fact that this suit is properly before this Court for the purpose of determining whether or not the ruling of the Secretary of Agriculture is in accordance with law.

The statute involved is the Act of May 12, 1933, 48 Stat. 31, as amended May 9, 1934, 48 Stat. 670, 675, as further amended and re-enacted by the Agricultural Marketing Agreement Act of 1937, 50 Stat. 246, 7 U.S.C.A. § 601 et seq., hereinafter referred to as the Act.

The order involved is Order No. 27 regulating the handling of milk in the New York Metropolitan milk marketing area, and the order, as amended, regulating the handling of milk in the same area, both of which were issued by the Secretary of Agriculture pursuant to the powers invested in him by the Act. Order No. 27 was originally effective September 1, 1938; and the order, as amended, was issued effective May 1, 1940.

Order No. 27 and the same order, as amended, are binding upon the plaintiff and many other handlers of milk similarly situated.

To obtain a clear view of the point at issue, it will be of value to briefly describe the marketing conditions existing prior to the Act in the New York milk marketing area and to summarize the history of milk regulation up until that time, in order to understand the problem which the New York milk marketing order was designed to solve.

Regulation of the milk produced for the New York milk market began during the lean year of 1935 with the institution of the State Milk Control. Opposition to the State Act culminated in the "Nebbia case" (Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469) in which state control of milk prices to producers was upheld by the

Supreme Court of the United States. Due to the availability of large supplies of milk from other states, flowing into New York by way of interstate commerce, it was impossible for the New York Milk Control to effectively regulate the intrastate milk, causing the interposition of the Federal Government and the issuance of the order in question, effective September 1, 1938.

The public hearings held before the issuance of the order disclosed that the production and distribution of milk for the New York milk market constitutes one of the most complex distributing mechanisms in the United States. About sixty thousand producers produce milk which is delivered twice daily to approximately four hundred milk receiving stations. From there, the milk flows in an infinite variety of channels to emerge finally in a vast number of different products, which in turn pass through the hands of numerous operators before finally reaching the ultimate consumer.

One of the very uneconomic practices shown was the unnecessary movement of milk and cream from plant to plant and operator to operator. Furthermore, the system of classification gave rise to attempts on the part of some handlers to manipulate the distribution of milk and cream so as to be able to claim its use in products to which a lower price attached, whereas in fact the products were actually in classes to which much higher prices were applicable.

After considering all of the evidence submitted, the Secretary of Agriculture decided that a use classification scheme which would make it possible for all handlers to secure milk products for use in a particular classification at the same cost as their competitors and which would prevent unnecessary movement of milk and cream from plant to plant would facilitate the effectuating of the declared policy of the Act. The classification scheme described in Order No. 27 is the result of that decision. Under it, handlers who desire to purchase milk for Class I purposes can purchase it from any country receiving plant and have such milk shipped directly to him. If these plants are located in the marketing area, the order requires its classification into Class I. If the plants are situated outside the marketing area, the milk may be classified in accordance with the form in which it leaves such second plant. In other words, an operator desir-

ing to manufacture ice cream, evaporated milk or other products made from milk or cream, may purchase his milk or cream from a plant receiving milk from producers and manufacture it into any product he chooses, and have that product properly classified in the class into which it falls.

It must be borne in mind that nowhere is there a milk market to compare with the vastness of the New York milk market. The amount of fluid milk needed in the market is so great that the seasonal variation in deliveries of milk of producers brings about an immense volume of milk in excess of fluid requirements at certain times of the year. In order to take advantage of economies of specialization in plant operation, this volume prompted plant operators to become specialists in converting the fluid milk into a particular product, which was sold to other operators who in turn converted that product into another form. This resulted in the establishing of assembly lines in the processing of milk, with each plant operator performing his special job. Thus, plant operators developed who purchased milk from producers but did not distribute it in the marketing area, selling it to other operators instead.

Due to this complexity in milk distribution, the Act was promulgated to insure the producers' receiving specified prices for their milk according to its different uses by "handlers".

It is easy to realize how the hugeness and the far-reaching scope of the New York milk market, comparable to no other milk market, presented a most complicated problem with which the government authorities were faced in formulating orders of regulation. It was well nigh impossible to issue any order which would completely satisfy all who handled milk.

Epitomizing the pertinent and uncontradicted facts in this present case, it develops that plaintiff was a plant operator at Canastota, New York, at which it received milk from producers, separated it into cream, condensed milk and other products, and then shipped it to its Long Island City, New York, plant by means of refrigerator or reefer trucks. From that point, it was transferred and delivered to the plants of ice cream manufacturers to be used in the manufacture of frozen desserts or homogenized mixtures.

At this point, the crux of this situation arises and the controversy between the

plaintiff and defendant occurs. Succintly stated, the Secretary of Agriculture reclassified the milk at plaintiff's Long Island City plant as fluid cream or Class II-A after the plaintiff had reported it in another classification. Plaintiff maintains that the reclassification of its milk product by the Secretary contravenes the authority granted to him under the Act.

As previously indicated, the classification fixed by the Secretary of Agriculture determines the particular price to be paid for the milk product. The prices vary in accordance with the classification into which the milk product is placed.

To continue with the facts concerned in the proceeding at bar, upon arrival at the Long Island City plant, the truck would generally be backed directly into the plant and some cans unloaded and placed on the platform of plaintiff's plant. These cans were placed in the refrigeration room of this plant but at some later time were reloaded onto smaller delivery trucks and delivered to consignees in and around New York City, and then the milk products were used in the manufacture of frozen desserts or homogenized mixtures.

The evidence showed that when the reefer truck was backed up to the loading platform, the truck would be entirely inside the plant building; but, if it were a very large truck, the front might stick out on the sidewalk a trifle bit. Sometimes, the reefer truck was stopped on the street immediately outside the plaintiff's Long Island City plant and the milk products were loaded directly from the refrigerator truck to smaller delivery wagons which then delivered the milk products to the various consignees in and around New York City as heretofore described.

For the period September 1, 1938, to May 1, 1940, the market administrator based his classification of plaintiff's milk products on the following sections of the New York milk order, which read in part as follows: "Article III, section 1, If milk is moved as cream, plain condensed milk, or homogenized mixtures from any plant outside the marketing area to any second plant, classification of such milk in the first plant may be in accordance with its utilization in such second plant." Article III, section 2, paragraph 2, defines Class II-A milk to be, "All milk the butterfat from which leaves or is on hand at a plant in the form of cream".

Thereafter, the market administrator reclassified plaintiff's milk products for the period from May 1, 1940 through October 1940, based upon section 927.3(a) (1) (ii) of the New York milk order, as amended May 1, 1940, which provided, in part, that "When milk the butterfat from which is moved as cream, plain condensed milk, or homogenized mixtures to a second plant inside or outside the marketing area, the classification may be in accordance with the form in which it is held at or moved from the second plant."

The administrator also took into consideration the proviso in section 927.3(a) (1) (iv) of the Order in his reclassification, which states: "The only form in which cream received in any plant in the marketing area may leave such plant so that the milk from which cream was manufactured may be classified other than Class II-A is in the form of frozen desserts, homogenized mixtures or cream cheese."

Restated, in both instances the market administrator's ruling was founded upon his interpretation that the movement of cream as related above constituted movement to a second plant, and that since the cream left the second plant in the marketing area in the form of cream, the milk from which such cream was manufactured must be classified in Class II-A.

Contesting this reclassification by the market administrator, the plaintiff filed a petition with the defendant, the Secretary of Agriculture, pursuant to the Act, 7 U.S.C.A. § 608c(15) (A), stating that the ruling and the obligations imposed thereunder are not in accordance with law. The petition was dismissed by the Secretary of Agriculture and the plaintiff has instituted this action for review of that ruling.

Supporting its position, the plaintiff argues (1) that the movement of the cream as indicated did not constitute movement to a second plant; contending that the consignees were the owners and operators of the second plant and therefore its milk products should have been classified as II-B or III-C; (2) that if the ruling of the Secretary is upheld and the cream was properly classified in Class II-A, the order is invalid since this method of classification is not, according to the plaintiff, classification "in accordance with the form in which or the purpose for which it is used", as is provided by Section 8c(5) (A) of the Agricultural Marketing Agreement Act of 1937, 7 U.S.C.A. § 608c(5) (A).

Before weighing the arguments presented, the scope of the review conferred upon this Court should be defined. The jurisdiction to entertain an action for a review of a ruling by the Secretary of Agriculture is acquired by Section 8c(15) (B) of the Agricultural Marketing Agreement Act of 1937, 7 U.S.C.A. 608(c) (15) (B), which provides: "(B) The District Courts of the United States (including the district court of the United States for the District of Columbia) in any district in which such handler is an inhabitant, or has his principal place of business, are hereby vested with jurisdiction in equity to review such ruling, provided a bill in equity for that purpose is filed within twenty days from the date of the entry of such ruling. Service of process in such proceedings may be had upon the Secretary by delivering to him a copy of the bill of complaint. If the court determines that such ruling is not in accordance with law, it shall remand such proceedings to the Secretary with directions either (1) to make such ruling as the court shall determine to be in accordance with law, or (2) to take such further proceedings as, in its opinion, the law requires."

■ ■ Thus, a method of review for errors of law in an opinion or ruling by an administrative officer is provided and the review is limited to such errors, if they should exist. Should a ruling be determined as not in accordance with law, the proceedings must be remanded to the Secretary of Agriculture with directions. The review must be based on the record before the Secretary. A trial de novo cannot be conducted nor new issues of fact injected into the case. New York State Guernsey Breeders' Cooperative, Inc., et al. v. Wallace, Secretary of Agriculture, D.C., 28 F.Supp. 590.

■ The findings of the administrative officer are conclusive if there is any evidence to support them and the Court may not weigh the evidence and substitute its independent findings for those of the administrative officer. Clark v. Portland General Electric Company, 9 Cir., 111 F. 2d 703; Potomac Electric Power Company v. Cardillo, 71 App.D.C. 163, 107 P. 2d 962; and Bethlehem Ship Building Corporation v. Cardillo, 1 Cir., 102 F.2d 299.

In Speaks v. Hoage, 64 App.D.C. 324, 78 F.2d 208, it was held that in no case can the Court substitute its findings of fact for those of an administrative officer, except where that individual's findings are arbitrary, capricious, unreasonable, or not supported by any evidence. If the conclusions are supported by any evidence they are final.

In the case at bar, there is no question that the plaintiff was afforded a full, fair and complete hearing and the ruling was based on substantial evidence.

Reference to the ruling of the Secretary of Agriculture indicates that his conclusion that the cream in question was held at or moved from the Long Island City plant of the plaintiff was in conformity with the ruling made on the petition of Grandview Dairy, Inc., and Arkport Dairies, Inc., Vol. I, No. 2, page 133 of Agriculture Decisions. The "Grandview" ruling held that "plant", within the meaning and intent of the terms of the order here concerned, includes that part of the street which is adjacent to the building in which the handler's facilities and equipment are situated; on which operations are carried on in the handler's behalf by those who are subject to the supervision or control of the persons who carry on operations in the building; and which is used for carrying on operations related to those which are carried on within the building. Therefore, applying this principle it must be concluded that the cream and condensed milk transferred from truck to truck in the adjacent street, and, a fortiori the cream and condensed milk which physically entered the building or rested on the platform, were utilized at or held at or moved from the Long Island City plant of the plaintiff, a second plant, within the meaning and intent of Order No. 27.

The complex mechanism of handling and disposing of milk products in the New York Metropolitan area is certain to precipitate situations in which the Secretary of Agriculture must use his discretionary power. There is no doubt that it was the intent of Congress to confer discretionary power upon the Secretary. Interpreting regulations and applying them to varied circumstances are within the sound discretion of the Secretary of Agriculture, but even though it would seem to work a hardship in some instances, the principle involved must be adhered to in order that all who come within the purview of the orders will have the same obligations or privileges as the case may be.

■ From a study of the facts and evidence before the Secretary in the instant

matter, it is the opinion of this Court that the Secretary was justified in holding that the Long Island City plant of the plaintiff was a "second plant"; and that the market administrator was required to reclassify the milk; and that such ruling is in accordance with law.

■ Certain limitations have to be set by the Secretary in handling milk products and their classification; otherwise, would it not leave a wide opening for subterfuge in having it possible for another point of delivery to be still considered the "first" plant, thereby enabling the milk or its products to be classified in a group to which it would not be entitled? Of course, such is not the circumstances herein; but the regulations have been ordered and the limitations have been set and the Secretary is bound to adhere to same even though it would seem a hardship is being imposed; thereby obviating any chance of a handler's obtaining a classification to which he is not entitled and protecting all handlers by a uniformity of the application of the regulations so that the obligations imposed will be equal, and the possibility of circumvention by a few to the detriment of the rest of the handlers eliminated.

Having concluded that the ruling of the Secretary of Agriculture that the cream in question was held at or moved from the plaintiff's Long Island City plant, identifying it as a "second" plant, thereby causing the milk product to fall in Class II-A, it now becomes incumbent upon the Court to determine whether or not the method of classification set forth in the New York Milk Order (Order No. 27) complies with the requirements of Section 8c(5) (A) of the Agricultural Marketing Agreement Act of 1937, which requires the Secretary to classify milk in accordance with the form in which or the purpose for which it is used.

The plaintiff contends that Section 8c (5) (A) of the Act means that milk cannot be classified until it and the various products manufactured from it have been "ultimately used". The Secretary of Agriculture has construed the Act under the discretionary power invested in him to mean that the use classification of milk may be established according to the form in which it leaves a second plant outside the marketing area and the use classification of milk which is made into cream may be established by the form in which it leaves a second plant regardless of where the plant is located.

■ The history of the development of the Act shows that it was never intended that the so-called "ultimate utilization" of milk should be the basis of classification. Congress was aware in 1935 when it amended the Act (its reenactment occurring in 1937) that cooperative associations who had adopted the classification system of milk long prior to State or Federal regulation did not make the use classification of milk sold by them dependent upon any "ultimate use" by their successive purchasers. Were the plaintiff's interpretation to be substantiated, it would become necessary for the Secretary of Agriculture to note the changes in the milk until it was actually consumed by the public. This onerous duty was never intended to be exacted of the Secretary of Agriculture. The interpretation of use classification as that of "ultimate use" is impossible. The Act, when it speaks of "use", does not mean "ultimate utilization" but rather "use" by the respective handlers, since the Secretary can regulate only those handlers as defined in the Act and any use classification of milk must be dependent upon its use by a "handler".

Therefore, the provisions of the New York milk order (Order No. 27) have been issued by the Secretary of Agriculture strictly in accordance with law. The market administrator correctly interpreted the provisions of the order and the Secretary of Agriculture was not in error when he denied the plaintiff's petition.

The motion of the defendant is in all respects granted and summary judgment in favor of the defendant against the plaintiff is granted, adjudging and decreeing that the ruling of the Secretary of Agriculture of the United States complained of herein is in accordance with law. The cross motion of the plaintiff is therefore denied.